1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

9

SAN PASQUAL BAND OF MISSION
INDIANS, a federally recognized Indian
Tribe,

Plaintiff,

vs.

STATE OF CALIFORNIA, CALIFORNIA
GAMBLING CONTROL COMMISSION, an
Agency of the State for California, and
ARNOLD SCHWARZENEGGER, as
Governor of the State of California,

Defendants.

CASE NO. 06cv0988-LAB (AJB)

**ORDER GRANTING MOTION TO
DISMISS SECOND AMENDED
COMPLAINT**

[Dkt No. 13]

Plaintiff the San Pasqual Band of Mission Indians ("San Pasqual"), a federally recognized

Indian Tribe, seeks declaratory relief in this action against the State of California, the California

Gaming Control Commission ("Commission"), and Governor Arnold Schwarzenegger (collectively

"Defendants" or "State") related to its 1999 Tribal-State Compact, under the Indian Gaming Regulatory

Act of 1988 ("IGRA"), 25 U.S.C. §§ 2701, *et seq.* This matter is before the court on the State's Motion

To Dismiss Second Amended Complaint ("Motion") pursuant to FED.R.CIV.P. ("Rules") 12(b)(7),

(19). San Pasqual filed Opposition, and Defendants filed a Reply. In addition, the court accepted

briefs from two *amicus curiae*: the California Nations Indian Gaming Association ("CNIGA")

opposing Defendants' Motion; and the California Tribal Business Alliance and the Rumsey Band of

Wintun Indians (collectively "Rumsey") in support of the Motion.

On February 26, 2007, the court convened the Motion hearing. Stephen Solomon, Esq.

appeared for San Pasqual. Randall A. Pinal, Esq. appeared for Defendants. Frank Lawrence, Esq.

appeared for *amicus curiae* CNIGA.   Fred J. Hiestand, Esq. appeared for *amicus curiae* Rumsey. Attorneys R. Bruce Evans, Esq., Peter Kaufman, Esq., and Ryan Kroll, Esq. also appeared.   For the reasons recited on the record and as discussed below, the Motion is **GRANTED**.

## I.      BACKGROUND

The State entered individual Compacts with approximately 60 Indian tribes in September 1999. The Compacts authorize the participating tribes to own and operate Indian Gaming facilities on their Reservations.  As pertinent here, the Compacts regulate Class III Gaming Devices (slot machines) and incorporate a formula for calculating the aggregate maximum number of licenses available to all Class III gaming tribes statewide, with an individual tribal limit of 2,000 each. San Pasqual alleges the State denied its application for additional licenses within its individual limit on grounds no more were available.   In this action, San Pasqual alleges the State's calculation of the total aggregate  number of licenses under the Compact formula is too low.   The tribe seeks a judicial determination of the question:  what is the correct number of Class III Gaming Device licenses authorized in the aggregate by the State Aggregate Limit formula contained in San Pasqual's Tribal-State Gaming Compact?

Defendants contend the Second Amended Complaint ("SA C") must be dismissed on grounds San Pasqual failed to join all 61 other tribes who executed 1999 Compacts materially identical to San Pasqual's. They assert those absent parties are necessary and indispensable to this action because San Pasqual challenges the State's interpretation and application of a formula common to all those Gaming Tribes who obtain Class III device licences under the 1999 Compacts.   They argue each individual Compact tribe has a beneficial interest in any judicial construction of the aggregate limit provision and a legally protected stake in this litigation that would be impaired by a favorable judgment for San Pasqual.  They also argue disposition of this action in the absence of the other Compact tribes would subject the State to inconsistent obligations.  However, the absent tribes cannot be joined because they enjoy tribal sovereign immunity from suit, and Defendants argue neither the State nor San Pasqual can adequately represent all tribal interests.   The narrow issue presented here is whether Rule 19, addressing the joinder of parties indispensable for just adjudication, requires dismissal of this action.

\\

\\

1    **II.    DISCUSSION**

2         **A.    Indian Gaming Regulatory Act ("IGRA")**

3         Congress enacted IGRA, 25 U.S.C. § 2701, *et seq.*, in 1988 to provide a statutory basis for the

4    operation of gaming by Indian tribes as a means "to promote tribal economic development, tribal self-

5    sufficiency, and strong tribal government." 25 U.S.C. § 2701(4). The statute grants states a role in

6    the regulation of Indian gaming. Artichoke Joe's v. Norton, 353 F.3d 712, 715 (9th Cir. 2003). IGRA

7    makes Class III gaming activities lawful on Indian lands if (among other things), the activities are

8    "located in a State that permits such gaming for any purpose by any person, organization, or entity"

9    and are "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and

10   the State under paragraph (3) that is in effect." 25 U.S.C. §§ 2710(d)(1)(B),(C). After a tribe and the

11   Governor negotiate a compact in California, the Legislature must ratify it.[1] Cal. Const. art. IV, § 19(f);

12   25 U.S.C. § 2710(d)(8). The Secretary of the Interior then "is authorized to approve any Tribal-State

13   compact entered into between an Indian tribe and a State governing gaming on Indian lands of such

14   Indian tribe," and may disapprove a Tribal-State compact "only if such compact violates -- (i) any

15   provision of this chapter, (ii) any other provision of Federal law that does not relate to jurisdiction over

16   gaming on Indian lands, or (iii) the trust obligations of the United States to Indians." 25 U.S.C. §

17   2710(d)(8)(A),(B). The tribal-State compact becomes effective when the Secretary approves it.

18        **B.    The 1999 Compacts**

19        As traced in Defendants' Motion, the State and 57 federally-recognized California Indian tribes

20   (including San Pasqual) executed nearly identical Compacts on September 10, 1999, to enable each

21   of those tribes to conduct Class III gaming on Indian lands as defined by IGRA. Ultimately 62 tribes

22   separately signed the 1999 Compact. The Legislature ratified the 1999 Compacts, and the Secretary

23   approved them by publication in the Federal Register on May 16, 2000.

24   _____

25        [1]  "(3)(A) Any Indian tribe having jurisdiction over the Indian lands upon which a class III gaming
     activity is being conducted, or is to be conducted, shall request the State in which such lands are located to
26   enter into negotiations for the purpose of entering into a Tribal-State compact governing the conduct of gaming
     activities. Upon receiving such a request, the State shall negotiate with the Indian tribe in good faith to enter
27   into such a compact. [¶]  (B) Any State and any Indian tribe may enter into a Tribal-State compact governing
     gaming activities on the Indian lands of the Indian tribe, but such compact shall take effect only when notice
28   of approval by the Secretary of such compact has been published by the Secretary in the Federal Register."
     25 U.S.C. § 2710(d)(3)(A),(B).

The 1999 Compacts "are identical in most respects." <u>Artichoke Joe's v. Norton</u>, 216 F.Supp.2d 1084, 1094 (E.D.Cal. 2002), *aff'd* 353 F.3d 712 (9th Cir. 2003).  The Compacts specify that each tribe may operate up to 2,000 Gaming Devices and establish a statewide maximum number of Gaming Devices that all 1999 Compact Tribes may license in the aggregate.  Compact § 4.3.2.2(a) (San Pasqual Compact, Exh. A to Defendants' Request For Judicial Notice ("Compact")).  Gaming Device licenses are distributed among all Compact Tribes pursuant to a license draw process described in the Compact, with licenses awarded based on a tribe's placement in a series of priority tiers established by, among other criteria, the number of Gaming Devices operated by the tribe.  Compact § 4.3.2.2(a)(3); *see* SAC ¶ 18.

## C.   The Dispute

The provisions relating to the allocation of Class III Gaming Device licenses, including the formula for calculating the statewide aggregate cap, is common to all the 1999 Compacts. The Compact also provides that each individual tribe may operate no more than 2,000 slot machines.  San Pasqual currently operates fewer than 2,000 slot machines and, prior to filing its lawsuit, it "requested Gaming Device licenses from the State through the draw process, but was informed by the State that there are no more Gaming Device licenses available," so "was denied its requested Gaming Device licenses."  SAC § 24.

San Pasqual alleges the State's June 2002 interpretation of Compact § 4.3.2.2(a)(1) constituted a breach of the Compact in that its calculation of the aggregate limit is too low.  The tribe alleges the State unilaterally and erroneously determined only 32,151 Gaming Device licences are available statewide, whereas previously the State had stated the aggregate limit was considerably higher. SAC ¶ 23.  It is San Pasqual's position "that under § 4.3.2.2(a)(1) of the Compact, the State Aggregate Limit **authorizes at least 42,700 Gaming Device licenses**, and the Defendants, through their erroneous interpretation, have breached the Compact by refusing to make all Gaming Device licenses authorized by the Compact available through the Gaming Device license draw process."  SAC ¶ 25 (emphasis added); *see* SAC ¶ 26 (San Pasqual argues "the Compact **authorizes the issuance of at least 42,700 *additional* Gaming Device licences** through the Gaming Device license draw process") (emphasis added).  San Pasqual seeks "a judicial determination as to the correct number of Gaming

Device licenses authorized in the aggregate by the State Aggregate Limit formula contained in its Tribal-State Gaming Compact between San Pasqual and the State."  SAC 8:4-6.

      a.      Section 2.6 of the Compact defines the term "Gaming Device" to mean a slot machine.

      b.      Section 4.3.1 of the Compact authorizes the San Pasqual to operate either:  a) the number of Gaming Devices operated by San Pasqual on September 1, 1999; or b) 350 Gaming Devices, whichever is larger.  Under § 4.3.1.(b), San Pasqual is authorized to operate and does operated 350 Gaming Devices as a matter of right.

      c.      Section 4.3.2.2 of the Compact provides that San Pasqual may acquire Gaming Device licenses to operate Gaming Devices in excess of 350.  For each  Gaming Device license obtained, San Pasqual must pay the applicable fees to be deposited in the Revenue Sharing Trust Fund.[2]

      d.      The number of Gaming Device licenses San Pasqual may obtain **is limited by** the State Aggregate Limit, contained in § 4.3.2.2(a)(1) of the Compact, on **the number of Gaming Devices that all tribes in the aggregate may license** and the 2,000 per-tribe Gaming Device limit contained in § 4.3.2.2.(a).

      e.      Section 4.3.2.2(a)(1) of the Compact **caps the State Aggregate Limit of licenses** as follows:

> **"The maximum number of machines that all Compact Tribes in the aggregate may license pursuant to this Section shall be a sum equal to 350 multiplied by the number of Non-Compact tribes as of September 1, 1999, plus the difference between 350 and the lesser number authorized under Section 4.3.1."** [ 3 ]

      f.      Currently, San Pasqual is authorized to operate 1,572 Gaming Devices.

---

[2]  The Revenue Sharing Trust Fund ("RSTF"), defined in Compact Section 4.3.2(a)(ii), is funded by the fees paid for Gaming Device licenses.  The RSTF funds are distributed to those tribes in California who operate fewer than 350 Gaming Devices.

[3]  Section 4.3.1 provides:  "The Tribe may operate no more Gaming Devices than the larger of the following:  (a) A number of terminals equal to the number of Gaming Devices operated by the Tribe on September 1, 1999; or (b) Three hundred fifty (350) Gaming Devices."  Section 4.3.2.2(a)(1), (2) provides: "The Tribe, along with all other Compact Tribes, may acquire licenses to use Gaming Devices in excess of the number they are authorized to use under Sec. 4.3.1, but in no event may the Tribe operate more than 2,000 Gaming Devices, on the following terms, conditions, and priorities:  (1) The maximum number of machines that all Compact Tribes in the aggregate may license pursuant to this Section shall be a sum equal to 350 multiplied by the number of Non-Compact tribes as of September 1, 1999, plus the difference between 350 and the lesser number authorized under Section 4.3.1; (2) The Tribe may acquire and maintain a license to operate a Gaming Device by paying into the Revenue Sharing Trust Fund, on a quarterly basis, in the following amounts [followed by chart of four escalating annual fee-per-device categories by range of numbers of licensed devices."

1   SAC ¶ 16 (emphasis added); *see* Compl. Exh. A.

2       San Pasqual alleges the State has "issued several different and wildly conflicting conclusions

3   that the 1999 Model Compacts, including San Pasqual's Compact, authorize as many as 60,000

4   Gaming Device licenses to be dispersed through the Gaming Device license draw process," whereas

5   in or around June 2002, Defendants allegedly "breached" the Compact by "unilaterally and erroneously

6   determin[ing] that the State Aggregate Limit stated in § 4.3.2.2(a)(1) of the Compact authorizes a

7   Statewide Aggregate Limit of only 32,151 Gaming Device licenses," a figure it continues to enforce.

8   SAC ¶¶ 22-23. San Pasqual does not allege a breach of contract cause of action.[4] Rather, the tribe uses

9   its breach allegations as a "backdrop" to illustrate "the State's wildly inconsistent determinations and

10  ultimate refusal to make available all Gaming Device licenses authorized by the Compact," purportedly

11  warranting judicial "determination of the number of Gaming Device licenses authorized in the

12  aggregate by the Compact between the State and San Pasqual." SAC ¶ 24.

13      San Pasqual relies on its own calculation of a higher aggregate number of licences, applying

14  the 1999 Compact formula.  San Pasqual wants the court to declare "the State Aggregate Limit

15  authorizes at least 42,700 Gaming Device licenses" (SAC ¶ 25) are available through the draw process,

16  rather than the State's lower calculation in order to force the State to revisit its decision to deny San

17  Pasqual's request for additional Gaming Device licenses on the stated ground "there are no more

18  Gaming Device licenses available"  (SAC ¶ 24), asking the court  to construe Compact § 4.3.2.2(a)(1)

19  without San Pasqual having to renegotiate its Compact.

20      The Compact describes the method by which the parties can modify or amend the terms and

21  conditions of the Gaming Compact at any time.  Compact § 12.1.  It is undisputed that in June 2004,

22  seven 1999 Compact tribes (including Rumsey) and the State renegotiated their Compacts.[5]  Those

23  ──────────────────

24      [4]  The SAC alleges one claim for relief: "[r]equest for judicial determination as to the correct number
    of Gaming Device licenses authorized in the aggregate by the State Aggregate Limit formula contained in its
25  Tribal-State Gaming Compact between San Pasqual and the State."  SAC 8:4-6.  The prayer for relief states:
    "That the Court declare that the Compact authorizes the issuance in the aggregate of at least 42,700 Gaming
26  Device licenses through the Gaming Device license draw process, and not 32,151 Gaming Device licenses as
    Defendants erroneously contend."  SAC 10:3-5.

27

28      [5]  The State represents the Governor also negotiated Compact amendments with six other tribes in
    2006, although not all those have been ratified by the Legislature and none has yet been approved by the
    Secretary.  *See* Mot. fn. 4, fn. 5.

modified Compacts incorporated "new rights and responsibilities for the parties (e.g., the State permits the tribe to operate additional Gaming Devices in exchange for, among other things, revenue payments to the State General Fund, and more comprehensive environmental and patron protection provisions)." Mot. 5:1-6.

San Pasqual attempts to characterize its action as limited to a construction solely of its own Compact with the State. Defendants move to dismiss this suit on grounds San Pasqual "challenges the State's interpretation and application of Compact provisions specifying the aggregate limit, without having joined the other tribes beneficially interested in this action's outcome." Mot. 1:13-15. The narrow issue the court decides here is whether this litigation can continue on the merits in the absence of all Indian Tribes who participate in the license draw process under their own Compacts with the State. Although understandings of the 1999 Compact, the process for awarding the Gaming Device licenses up to the aggregate limit, and the expectations of tribes who renegotiated their Compacts are necessary to perform the Rule 19 analysis, the court does not reach the merits of San Pasqual's requested declaratory relief.

### D. **Legal Standards**

If a necessary and indispensable party cannot be joined in an action, the case must be dismissed. The moving party has the burden of persuasion in arguing for dismissal. Makah Indian Tribe v. Verity, 910 F.2d 555, 558 (9th Cir. 1990). The court first determines whether the absent party is "necessary" to the suit. If an absent party necessary to the suit cannot be joined, the court must then determine whether the absent party is "indispensable" so that in "equity and good conscience" the suit should be dismissed. Rule 19(a), (b). Rule 19(a) provides, in pertinent part (emphasis added):

> A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined if *(1)* in the person's absence complete relief cannot be accorded among those already parties, *or (2)* the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. . . .

To satisfy Rule 19, only one of the two prongs defining necessary parties need be shown. Shimkus v. Gersten Cos., 816 F.2d 1318, 1322 (9th Cir. 1987). In deciding whether the absent party

1   is "necessary" under Rule 19(a)(1), the court "must decide if *complete relief* is possible among those

2   already parties to the suit," an analysis independent of the question whether relief is available to the

3   absent party. <u>Makah</u>, 910 F.2d at 558. Under Rule 19(a0(2), the court determines "whether the absent

4   party has a *legally protected interest* in the suit," a showing that must be more than a financial stake.

5   <u>Id.</u> "A fixed fund which a court is asked to allocate may create a protectable interest in beneficiaries

6   of the fund." <u>Id.</u>, *citing* <u>Witchita and Affiliated Tribes of Oklahoma v. Hodel</u>, 788 F.2d 765, 774

7   (D.C.Cir. 1986); *see* <u>American Greyhound Racing, Inc. v. Hull</u>, 305 F.3d 1015, 1023 (9th Cir. 2002)

8   (interests arising from terms in bargained contracts are also legally protectable).

9       "If a legally protected interest exists, the court must further determine whether that interest will

10   be *impaired or impeded* by the suit." <u>Id.</u> If no party in the suit adequately represents the absent party's

11   interest, then an identified impairment is not to be minimized. *Cf.* <u>Witchita</u>, 788 F.3d at 774-75

12   (observing the United States may adequately represent an Indian tribe unless there is a conflict between

13   the United States and the tribe).[6]   The court must also consider "whether *risk of inconsistent rulings*

14   will affect the parties present in the suit." <u>Makah</u>, 910 F.2d at 558-59; *see* <u>Witchita</u>, 788 F.3d at 774

15   (allocation of a limited fund to which absent parties are entitled may create such a risk).

16       "Only if the absent parties are 'necessary' and cannot be joined must the court determine

17   whether in 'equity and good conscience' the case should be dismissed under FED.R.CIV.P. 19(b)."

18   <u>Makah</u>, 910 F.2d at 559.  That analysis, in consideration of the substantive claims, proceeds through

19   a four-part inquiry. "First, *prejudice* to any party resulting from a judgment militates toward dismissal

20   of the suit." <u>Id.</u> at 560, *citing* <u>Witchita</u>, 788 F.2d at 775. "Second, *shaping of relief* to lessen prejudice

21   may weigh against dismissal." <u>Id.</u>, *citing* <u>Provident Tradesmens Bank & Trust Co. v. Patterson</u>, 390

22   U.S. 102, 111-112 (1968).  "Third, if an *adequate remedy*, even if not complete, can be awarded

23   without the absent party, the suit may go forward." <u>Id.</u>, *citing* <u>Witchita</u>, 788 F.2d at 777. "Finally, if

24   no *alternative forum* is available to the plaintiff, the court should be 'extra cautious' before dismissing

25   the suit." <u>Id.</u>

26   \\

27

28       [6]  States do not have the same fiduciary relationship to Indian Tribes as does the federal government.
<u>American Greyhound Racing</u>, 305 F.3d at 1023 n. 5 ("the State and tribes have often been adversaries in
disputes over gaming, and the State owes no trust duty to the tribes").

**E.     Evidentiary Objections**

San Pasqual objects Defendants lack evidence to support their assertion that "if San Pascal succeeds in this action, some 1999 Compact Tribes will necessarily suffer prejudice in the form of a resulting decrease in market share or diluted license value."   The court does not need to rely on the "market share" theory to find the prejudice element of the indispensable party analysis is satisfied. Moreover, any deficiency in the moving papers regarding the prejudice demonstration was cured by the Rumsey *amicus curiae* brief.  Similarly, the Rose Declaration San Pascal provided to challenge a dilution of market share argument, purporting to be expert opinion on the issue of whether the gaming device market in California could support a substantial increase in number of licenses of the magnitude San Pascal seeks to have this court declare, is immaterial to the result of the Rule 19 analysis, as the court has determined it cannot adjudicate the merits of the aggregate limit on gaming device licenses in the absence of indispensable parties who cannot be joined in this action.  The objection is **OVERRULED**.

Defendants' evidentiary objections and Motion To Strike the three Declarations/Affidavits San Pascal provided in support of its Opposition are **SUSTAINED**.  The issues presented by the Motion do not involve the merits of San Pasqual's substantive claim for relief.  The specific foundation and hearsay objections to particular portions of the Declaration contents are also sustained.

**F.     Arguments Presented**

San Pasqual disputes that any other Indian tribe is necessary or indispensable to this case because it purportedly seeks only a judicial determination of its own rights under its own bi-lateral Compact with the State, and argues the action implicates only prospective relief, so that no other tribe has a legally protected interest that will be impaired by this case going forward.  San Pasqual argues it seeks no allocation or reallocation of any gaming device licenses to itself or to any other tribe as relief in this suit, and it does not challenge the State's administration of the license draw process, other than to dispute an allegedly "erroneous" determination of the maximum number of gaming device licenses authorized under the Compact's State Aggregate Limit formula.  Opp. 3:22-25; *see* SAC ¶ 8. On those bases, San Pasqual attempts to distinguish Defendant's legal authority and argues:  "San Pasqual's requested relief would only add additional Gaming Device licenses to the statewide licensing

1    pool, and participation in future license draws (and payment of license fees) is purely voluntary." Opp.

2    12:6-11.

3         San Pasqual also purports to distinguish its request for "only a prospective judicial

4    determination of its compact rights" from the "previous litigation brought by various tribes concerning

5    a tribal-state gaming compact with the state" in the <u>Rincon</u> and <u>Colusa</u> cases.  The State requests

6    judicial notice of those two opinions:  <u>Rincon Band of Luiseno Mission Indians v. Governor and</u>

7    <u>Attorney General of California</u>, 04cv1151-W(WMc), Dkt No. 36 (decided March 22, 2005, granting

8    defendants' motion to dismiss for failure to join a necessary and indispensable party); and <u>Cachil Dehe</u>

9    <u>Band of Winton Indians of the Colusa Indian Community v. State of California, California Gambling</u>

10   <u>Control Commission, and Governor</u>, 2006 WL 1328267 (E.D. Cal. May 16, 2006) ("<u>Colusa</u>").  As

11   pertinent here, each of those rulings involved Rule 19 indispensable party analysis associated with

12   matters where a single 1999 Compact tribe sought, in the absence of other Gaming Tribes, a judicial

13   declaration that the State erred in calculating the Compact's aggregate Gaming Device license limit,

14   and that a far greater number should be made available.

15        The <u>Rincon</u> case involved a plaintiff tribe seeking "a declaratory judgment stating the correct

16   number of gaming device licenses available *under the 1999 Compacts*." Opp. 18:11-14.  In purported

17   contrast, San Pasqual represents it "explicitly limited the breadth of its Complaint to 'a judicial

18   determination as to the correct  number of Gaming Device licenses authorized by the State Aggregate

19   Limit formula contained in its Tribal-State Gaming Compact between San Pasqual and the State.'"

20   Opp. 18:16-20, quoting SAC ¶ 8.  The relief San Pasqual requests is that the court declare the

21   maximum number of Gaming Device licenses the State may issue statewide in the aggregate. San

22   Pasqual does not adequately explain how any judicial determination that a larger pool of licenses must

23   be made available than is recognized by the State, against which the State will be asked to apply the

24   formula for San Pasqual's requested additional licences, can avoid affecting all the other 1999

25   Compact calculations of the "correct number of Gaming Device licenses authorized by the State

26   Aggregate Limit formula" for any single tribe. San Pascal's characterization of its own action as

27   "explicitly limited" in breadth " to "a judicial determination as to the correct number of Gaming Device

28   licenses authorized by the State Aggregate Limit formula contained in its Tribal-State Gaming

Compact between San Pascal and the State," purportedly rendering <u>Rincon</u> "inapplicable to the instant matter" is unpersuasive. Opp. 18:11-21.  The formula in San Pasqual's 1999 Compact it asks the court to construe is the same for all the other Class III Gaming Tribes operating under 1999 Compacts. Accordingly, any judicial declaration that San Pasqual's calculation is correct and the State's is wrong would necessarily affect every tribe's decisions made in reliance on the maximum aggregate number of licenses available State-wide to the 1999 Compact tribes.

In <u>Colusa</u> (as pertinent here), the tribe challenged the Commission's interpretation of the authorized number of Gaming Device licenses.  As in <u>Rincon</u>, the <u>Colusa</u> court found the 1999 Compact Tribes were necessary and indispensable parties whose joinder was not possible due to the sovereign immunity of Indian tribes, and dismissed the claim analogous to the declaratory relief San Pasqual unilaterally seeks here.  The declaratory relief portion of the <u>Colusa</u> case addressing the aggregate limit formula is indistinguishable from this case: "At issue in plaintiff's first and second claims for relief is the validity of the State and CGCC's interpretation of the clauses set forth in § 4.3.2.2 of the Compact, addressing participation in Gaming Device license draws **and the authorized number of Gaming Device licenses**." <u>Colusa</u>, 2006 WL 1328267 at * 4 (emphasis added).  Like the Colusa tribe, San Pascal seeks a judicial determination of the validity of the State's interpretation of Compact § 4.3.2.2 setting the maximum number of authorized Gaming Device licenses.

The court concurs with Defendants:  "Except for different calculations, San Pasqual's claim is identical to those rejected [as not justiciable in the absence of the other 1999 Compact Tribes] by the courts in *Rincon* and *Colusa*."  Reply 9:1-3.  The State argues "[a]ll 1999 Compact-signatory Tribes are necessary and indispensable parties to this action." Mot. 14:6.  Although not binding on this court, the <u>Rincon</u> and <u>Colusa</u> decisions apply the Rule 19 analysis to the same problem as is presented here and are persuasive.  As a practical matter, the aggregate number of Gaming Devices under the formula in San Pasqual's Compact cannot be different from the aggregate number of Gaming Devices  under the same formula in every other 1999 Compact.

### G.     Necessary Parties Cannot Be Joined In This Action

San Pasqual's suggestion of unanimous tribal support for its position in this litigation does not survive  the demonstration by five tribes claiming a protected interest through the Rumsey *amicus*

1    brief.  Reply 6:24-26.  The Rumsey *amici* argue at least those tribes who renegotiated their 1999

2    Compacts with the State in 2004 are necessary and indispensable parties because the renegotiations

3    were conducted in reliance on the State's 2002 declared maximum aggregate limit on licenses available

4    under the 1999 Compacts.  The renegotiating tribes agreed to increased responsibilities in exchange

5    for more licenses in consideration of and reliance on the statewide maximum applicable to the 1999

6    Compact tribes.

7                          **1.    Complete Relief**

8         Each 1999 Compact contains the same formula for establishing the maximum number of

9    Gaming Device licenses available thereunder, and the language of the provision encompasses all the

10   1999 Compact Tribes:  "The maximum number of machines that *all Compact tribes in the aggregate*

11   may license pursuant to this Section shall be . . . ."  Compact § 4.3.2.2(a)(1) (emphasis added).  On that

12   basis, the State argues:  "The parties' rights and responsibilities under this term are not several or

13   distinct, and neither the State nor any signatory tribe is exempt or can opt out from this provision," so

14   that "it is not possible to have more than one determination of the Compact's aggregate Gaming Device

15   license limit without breaching the Compact."  Def.'s Reply To CNIGA Brief 4:11-14.  In the absence

16   of all 1999 Compact tribes, the State argues "complete relief cannot be accorded among those already

17   parties."  Rule 19(a)(1).

18        The State would be bound by a favorable decision for San Pasqual altering the total aggregate

19   limit of all Class III gaming device licenses, creating potential collateral estoppel consequences in

20   future actions.  "[T]he State bargained with all [1999] Compact tribes, individually and collectively,

21   for a limitation on the total number of Gaming Device licenses," so that "the State is entitled to have

22   a judgment that includes all Compact tribes."  Reply 6:17-23; *see* Def.'s Reply To CNIGA Brief 2:11-

23   21.  The court finds "complete relief" is not available in the absence of, at a minimum, the 1999

24   Compact tribes, irrespective of San Pasqual's argument it seeks on ly a determination peculiar to its

25   own "bi-lateral compact," because there can be but one total aggregate number.

26        In addition, Defendants would be exposed to inconsistent obligations were San Pasqual granted

27   the requested relief ostensibly to itself alone.  In belaboring the difference between "inconsistent

28   adjudications" and "inconsistent obligations," San Pasqual argues "district courts have previously

misapplied the 'inconsistent obligation' standard in those cases relied on by the State." Opp. 13:7-14:3. However, San Pasqual's argument <u>Colusa</u>, for example, "wrongly applied the 'inconsistent adjudication' standard instead of the correct 'inconsistent obligations' standard as required by Rule 19" is unpersuasive, because irrespective of the label that court used, its holding clearly describes the risk of inconsistent obligations. San Pasqual argues the various tribal-state gaming compacts are "separate bilateral agreements," so that "the understanding, expectation, and intent of the individual parties may be very different -- even though the language may be nearly identical to other tribal-state gaming compacts." Opp. 13:19-23. Even though performance details in the individual bilateral agreements may vary from compact to compact, the import of San Pasqual's request that the court calculate and declare a particular aggregate number of Gaming Device licenses under the 1999 Compacts using the uniform formula common to all cannot be adjudicated as the "bilateral" and "independent" construction urged by San Pasqual, but rather would expose the State to inconsistent obligations should other tribes seek and obtain a different aggregate number ruling. Opp. 13:19-23.

**2.     Absent Parties Have Legally Protected Interests In The Suit That Would Be Impaired Absent Joinder**

Defendants argue: "The number of Gaming Device licenses is a single, fixed amount uniformly applicable to all Compact tribes, giving each an interest in any action challenging the existing interpretation of that amount." Reply 1:2-9. San Pasqual does not dispute the "Compact provision establishing the formula for determining the statewide limit is a uniform and material term in every compact." Reply 1:21-23. While "Compacts are nominally bilateral," certain material provisions "including the formula for determining the aggregated Gaming Device license limit, are equally binding on the State and on all signatory tribes." Reply 2:3-5.

> Each Compact is one of sixty-two virtually identical, mutually interdependent Compacts that represent an integrated agreement amongst the State and all signatory tribes on the scope and regulation of class III tribal gaming in California. The uniform term establishing the maximum number of Gaming Device licenses available statewide under the 1999 Compact appears in all 1999 Compacts. **Indeed, that term's plain language expressly requires inclusion of all Compact tribes in determining the total number of available licenses**: "The maximum number of machines that *all Compact tribes in the aggregate* may license pursuant to this Section shall be . . . ." (Compact, § 4.3.2.2(a)(1) (emphasis added). The parties' rights and responsibilities under this term are not several or distinct, and neither the State nor any signatory tribe is exempt or can opt out from this provision. Therefore,

- 13 -

1                   it is not possible to have more than one determination of the Compact's

2                   aggregate Gaming Device license limit, without breaching the Compact.

3 Reply 2:5-16 (emphasis added).

4       Defendants contend all Compact tribes have a legally protected interest in any judicial

5 declaration of the total number of Gaming Device licences authorized by the Compact, distinguishing

6 that interest from a purely financial interest for purposes of satisfying Rule 19 criteria: "the interest

7 is the bargained-for, fixed fund that is the aggregate Gaming Device license pool." Reply 2:22-3:1.

8 Makah, 910 F.2d at 558 ("A fixed fund which a court is asked to allocate may create a protectable

9 interest in beneficiaries of the fund"). "Interests arising from terms in bargained contracts are also

10 legally protectable, so long as the relief sought would, if granted, render 'the compacts less valuable

11 to the tribes' and thereby 'impair' tribal interests in them." Reply 3:5-8, *quoting* American Greyhound

12 Racing, 305 F.3d at 1023.

13                   San Pasqual attempts to disguise this suit as a simple judicial

14                   determination of the correct number of aggregate Gaming Device licenses authorized by the Compact. In reality, however, the suit

15                   furthers San Pasqual's independent desire to immediately operate additional Gaming Devices. It also disregards the available and more

16                   appropriate Compact remedy of negotiating a new compact or an amendment to the Tribe's existing compact, similar to those negotiated

17                   by other tribes for additional Gaming Devices. Although San Pasqual asks this Court to order the State to make additional licenses available

18                   to all Compact Tribes, not all tribal interests are identical, nor can they be adequately represented by the parties to this action. At bottom, this

19                   case represents an attempt by a single Indian tribe to have this Court place that tribe's sovereign interests above the sovereign interests of the

20                   State and at least 61 other federally recognized tribes in California, without input from those other tribes. The law does not countenance

21                   such action.

22 Mot. 1:16-2:3.

23       San Pasqual argued no other tribe has claimed an interest in the outcome of this litigation, so

24 the court should not find any absent party is "necessary" to afford complete relief. Opp. 8:20-22. San

25 Pasqual represents each signatory tribe to the 1999 Model Compact was provided written notice of this

26 lawsuit seeking a judicial determination of the number of Gaming Device licenses authorized in the

27 aggregate by its Compact with the State, and as of the time the Opposition was filed, it received no

28 response from any tribe claiming an interest in the case. Opp. 9:12-16.

> In fact, because many other tribes recognize the importance of preserving the judicial remedy bargained for in the 1999 Model Compact, the *only* response by the other tribes has been to voice their support for the continuation of the case.[7] To wit, the California Nations Indian Gaming Association, the umbrella organization for a majority of California's gaming and non gaming tribes, was authorized by a unanimous vote of its tribal members to seek leave to file an Amicus Curiae brief in support of San Pasqual's case going forward.

Opp. 9:18-10:1.

The CNIGA *amici* provide historical context for the IGRA and the role of Tribal-State Compacts in implementing federal Indian policy.  They rely on canons of construction of agreements between the federal government and Indians based on that "unique trust relationship" favoring construction of such agreements "as the Indians understood them." CNIGA Brief p. 5.  On that basis, those *amici* argue San Pasqual should be allowed "to reach the merits of its case."  Id. 6:11-12.  CNIGA represents its "68 member tribes voted ***unanimously*** to support San Pasqual's position in this case," and "[n]o tribe to CNIGA's knowledge has claimed a legally cognizable interest in San Pasqual's compact." Id. 7:2-6.  CNIGA echos San Pasqual's argument that "Compacts are bilateral agreements between an individual tribe and an individual State, not multi-party agreements between all tribes and the State," so San Pasqual should be permitted "to enforce its compact terms."  Id. 7:11-23.  Nevertheless, CNIGA argues "all the 1999 Compacts do share an interest in preserving the dispute resolution provision of their individual compacts" it contends will be promoted if San Pasqual is permitted to proceed on its own. Id. 7:11-14.

\\

---

[7]  San Pasqual also argues the Compact § 9.1(d) specifically permits that "claims of breach or violation of this Compact" may be "resolved in the United States District Court where the Tribe's Gaming Facility is Located," so that the Compact "contains a waiver of both San Pasqual's and the State's sovereign immunity in the event that a dispute arises under the Compact." Opp. 20:1-9.  It contends the State's Motion is an attempt "to fundamentally alter the intent of the parties, and prevent San Pasqual from seeking a judicial determination of a crucial and  highly-debated provision of the Compact." Opp. 20:14-18.  San Pasqual relies on Cabazon Band of Mission Indians v. Wilson, 124 F.3d 1050, 1056 (9th Cir. 1997) in support of its argument the State is attacking the judicial rights bargained for in its Compact with San Pasqual.  However, San Pasqual's Complaint does not seek breach of contract relief, but only declaratory relief as to a specific calculation of a finite number of Gaming Device licenses it argues the State has miscalculated.  There is no issue, as in Cabazon, that the State is attempting "to defy or repudiate that very contract." Opp. 21:1-15, quoting Cabazon, 124 F.3d at 1056).  In addition, the palpable tension between San Pasqual's attempt to keep its declaratory relief focus from drifting into a breach of contract action only transparently hides the impairing effect of the court's construction of a contract provision common to multiple contracts the State has entered with dozens of absent parties, both on those parties and on the State.

The Rumsey *amici* dispel San Pasqual's and the CNIGA *amici*'s suggestions all Gaming Tribes universally support San Pasqual's unilateral pursuit of declaratory relief to increase the aggregate limitation on Gaming Devices contained in the common formula incorporated into each 1999 Compact. The Rumsey *amici* urge dismissal of this action on grounds at least those 1999 Compact Tribes who have since negotiated amendments to their Compacts with the state -- if not all the 1999 Compact Tribes as well -- are indispensable parties who are immune from suit and cannot be joined. Those *amici* explain Rumsey and certain other tribes renegotiated and amended their Gaming Compacts with the State in 2004, in reliance on the State's determination under the 1999 Compact formula an overall aggregate limit of 32,151 licenses were available to most of the Gaming Tribes, who continue to operate under the 1999 Compacts. They contend they relied on that figure for purposes, among others, of calculating how much each renegotiating tribe felt it was able and willing to pay the State for additional licenses. The State argues the other tribes' beneficial interest in the outcome of this litigation is not simply "market share."

> While some tribes have negotiated Compact amendments to increase market share, they have done so based upon the mutual understanding amongst all Compact parties that a finite number of licenses [is] available statewide under the 1999 Compact. . . .[T]he harm to interests of tribes with Compact amendments is very real, as is the harm to the State and all 1999 Compact tribes.

Reply 4:4-11.

The court finds the absent parties have a legally protected interest in the suit, under either a "fixed fund" theory or under the theory that interests arising from terms in bargained contracts are protected interests, inasmuch as a determination of the maximum number of licenses available collectively to all the 1999 Compact tribes is uniformly applicable to all through a formula common to all those Compacts. The Rumsey *amicus* brief defeats any argument that San Pascal can represent the tribal interests of all the tribes who entered 1999 Compacts. Although the tribes who subsequently renegotiated their tribes may no longer be bound by the aggregate limit calculated under the 1999 Compact formula, they relied on the aggregate limit figure applicable to the 1999 Compacts to make their decisions about the number of additional licenses they would pursue and the consideration they were willing to pay to exceed those limitations. Permitting San Pasqual, or any other of the 1999

1   Compact tribes, to unilaterally obtain a judgment declaring a different aggregate maximum number

2   of licenses would impair or impede other tribes' bargains and material assumptions.

3        **3.**    **Necessary Parties Cannot Be Joined**

4        The State takes issue with the CNIGA representation that the State can "adequately represent"

5   the position of any 1999 Compact tribe that might share the State's view (CNIGA Brief 8:4-6),

6   observing the Ninth Circuit "has unequivocally held that a governor of a state cannot adequately

7   represent the interests of an absent compacting tribe, even though both the state and the tribe may wish

8   to uphold the legality of a gaming compact." Def.'s Reply To CNIGA Brief 4:28-5:3, *citing* American

9   Greyhound Racing, 305 F.3d at 1023 n.5 ("the State and tribes have often been adversaries in disputes

10  over gaming, and the State owes no trust duty to the tribes"). The court finds the reasoning in Rincon

11  and Colusa persuasive on both the necessary parties and the sovereign immunity questions. The court

12  rejects CNIGA's suggestion the waiver of sovereign immunity in the 1999 Compacts at Section 9.4

13  would permit joinder of the other tribes in these circumstances. CNIGA Amicus Brief 11:17-23.

14       **4.**    **The Necessary Parties Are Indispensable**

15       The court next decides whether the absent necessary parties are indispensable. San Pascal and

16  CNIGA argue the court could limit the application of prospective, equitable relief to San Pascal, so

17  no other tribes would be prejudiced. However, were San Pascal to prevail here, it would undoubtedly

18  pursue additional Gaming Device licenses in reliance on the higher declared aggregate number

19  available. At a minimum, those absent tribes with Compact amendments who relied on the fixed

20  license pool remaining unchanged from the number calculated by the State in 2002 would be

21  prejudiced, as discussed in the Rumsey *amicus* brief and above. The fixed nature of the license pool

22  was a material term all parties to the 1999 Compacts bargained for, including those who subsequently

23  negotiated amendments to their compacts with the State.

24       **a.**    **Prejudice**

25       The court finds the prejudice prong of the Rule 19 dismissal analysis is satisfied. The State

26  articulates the adverse effects on absent parties were the court to proceed with the declaratory relief

27  San Pasqual seeks, in particular those tribes aligned with the Rumsey tribe:

28            [San Pasqual's] narrow approach necessarily ignores the interests of
          1999 Compact Tribes that have negotiated amendments that permit

1                      them to operate additional Gaming Devices in exchange for increased
responsibilities. The amendments were based upon, *inter alia*, a mutual

2                      understanding between the State and each of those tribes regarding the
Compact's aggregate Gaming Device limit.  To permit San Pasqual to

3                      proceed with this action and possibly obtain the same benefit for itself
without a corresponding increase in obligations would significantly

4                      prejudice those tribes' -- and the State's -- interest.

5   Mot. 12:14-20.

6        The State also articulates prejudice that would flow to the other 1999 Compact Tribes who,

7   like San Pasqual, have not renegotiated their compacts if San Pasqual succeeds in this action.

8                      For example, the most obvious detriment would flow to tribes currently
operating the 1999 Compact-maximum 2,000 Gaming Devices, as they

9                      are necessarily ineligible for additional licenses, and the tribes with low
priority in the license draw process could receive no new licenses.

10                     These tribes would certainly be harmed if this Court determines -- as
San Pasqual requests -- at lest 10,549 more licenses are available to

11                     competing tribes.

12   Mot. 12:23-28.

13                  **b.**   <u>**Shaping Of Relief**</u>

14        The CNIGA *amicus curiae* brief argues the court has "better options available to it to address

15   the issues the State raises," and should not use the "drastic measure" of a Rule 19 dismissal to address

16   "the potential interests of those tribes," even were the court to find the absent tribes to be necessary

17   parties.  CNIGA Brief 2:3-9.  CNIGA urges the court not to dismiss under Rule 19, but rather to shape

18   "prospective equitable relief" in the form of an injunction to "provide plaintiff San Pascal with

19   complete relief, with no need to extend statewide to all tribes."  CNIGA 9:28-10:2.  The expectation

20   appears to be that if the court reached and granted the SAC declaration San Pascal seeks, then the State

21   would have to revisit its denial of additional gaming licenses on grounds none remained available

22   because the aggregate limit had been reached. The court fails to appreciate how a uniform term in all

23   the 1999 Compacts setting an aggregate limit affecting every 1999 Compact tribe can be separately

24   adjudicated as to any individual tribe who challenges the State's number without circumventing the

25   1999 Compact bargain as well as the Compact terms relating to Compact amendments.  The court

26   finds no unique relief for San Pasqual can be shaped that would not materially impact the interests of

27   all other Class III Gaming tribes.  Moreover, the nature of the "injunction" CNIGA refers to is unclear.

28   \\

1   San Pasqual neither requests, nor would the court order in these circumstances, the State to issue the

2   additional Class III Gaming Devices San Pasqual sought and was denied through the draw process.

3                    **c.      No Adequate Remedy Without The Absent Parties**

4          San Pasqual wants its calculation of the statewide aggregate limit substituted in place of the

5   State's calculation.   One obvious risk were the court to reach that question in the absence of all tribes

6   on a theory of bilateral contract is that each tribe could independently propose a variant of that number

7   and pursue inconsistent declarations of a term uniformly and contractually applicable to all.   The

8   remedy would also be "inadequate" here because San Pasqual assumes all tribes support increasing

9   the ceiling of available licenses, whereas, at a minimum, the Rumsey *amici* relied on the State's lower

10  figure in renegotiating their own Compacts.  San Pasqual does not explain how, under its "bilateral

11  contract" theory, any upward adjustment to the State's determination of the aggregate number of

12  Gaming Device licenses for purposes of San Pasqual's application for more could be reconciled with

13  any other tribe's bilateral contract claim for a judicial declaration of a different figure.  The State would

14  be in an untenable position *vis-a-vis* the implementation of a maximum number of licenses to award

15  process through the draw process.

16                            **d.      Alternative Forum**

17         The "alternative forum" element also weighs for dismissal.  CNIGA invokes "settled canons

18  of federal Indian law" in support of San Pasqual's effort to save its SAC from dismissal that shed little

19  light on the Rule 19 analysis.  Both San Pascal and CNIGA argue dismissal would "nullify the express

20  right of tribes to seek judicial remedies for state *breaches of compact . . .* "  CNIGA Brief 8:10-11.

21  However, San Pasqual is not pursuing a cause of action for breach of contract in this case.  Defendants

22  observe San Pasqual is free to request renegotiation of an amended Compact with the state as an

23  alternative to this litigation attempting to force the issuance of additional licenses.   Compact

24  amendments were the contractually contemplated means to increase the number of licenses a tribe is

25  authorized to pursue.  Mot. 13:4-7.  The CNIGA *amici* argument the State's suggestion is a "false

26  remedy" because of "an alleged breach of the Tribe's existing compact" is unpersuasive.  Id. 12:20-24.

27  The absence of a judicial forum to achieve its goal does not prevent dismissal when the other Rule 19

28  elements are satisfied. *See, e.g.* Quileute Indian Tribe v. Babbitt, 18 F.3d 1456, 1460 (9th Cir. 1994)

1   ("lack of an alternative forum does not automatically prevent dismissal of a suit"); Dawavendewa v.

2   Salt River Project Agric. Improv. and Power Dist., 276 F.3d 1150, 1162 (9th Cir. 2002) (listing cases);

3   Wilbur v. Locke, 423 F.3d 1101, 1115 (9th Cir. 2005) (finding absent Indian tribe indispensable

4   despite lack of an alternative forum); Manybeads v. United States, 209 F.3d 1164, 1166 (9th Cir. 2000)

5   (same).

6   **H.    The Case Must Be Dismissed "In Equity And Good Conscience"**

7        In consideration of all the argument, evidence, and authority presented, the court finds  this

8   case must be dismissed for inability to join indispensable parties.  The absence of all Tribes who have

9   relied on the State's calculation of the total aggregate number of Gaming Devices, under a formula

10   common to every 1999 Compact, does not permit the court, in "equity and good conscious," to decide

11   a single tribe's calculation of that aggregate total that conflicts with the State's operative figure.  With

12   respect to both the tribes claiming an interest in this action (*see* Rumsey *amicus curiae* brief) and with

13   respect to all the1999 Compact tribes, like San Pascal, which have not renegotiated their 1999

14   Compacts, the Rule 19 joinder criteria are satisfied, but each absent tribe cannot be joined due to their

15   sovereign tribal immunity.

16        Tribes like Rumsey, who renegotiated their Compacts with the State in  2004 in reliance on

17   the aggregate maximum number of licenses available to the remaining 1999 Compact tribes, "claim

18   an interest relating to the subject of the action and [are] so situated that the disposition of the action

19   may (i) as a practical matter impair or impede [their] ability to protect that interest. . . ." Rule 19(a).

20   A legally protected interest is created by the term of the 1999 Compact setting the formula and the

21   aggregate limit of Gaming Device licenses.   In addition, to resolve a dispute over the State's

22   interpretation of the maximum aggregate number of licenses without the participation of all 1999

23   Compact signatories risks impairing or impeding the absent tribes' interest.  The formula is common

24   to all the 1999 Compacts, and the State has declared and has enforced the finite number of licenses

25   it calculates under that formula.

26        Moreover, despite San Pasqual's effort to characterize the relief it seeks as prospective, the

27   State demonstrates the practical effect should San Pascal obtain the relief it seeks would be "purely

28   substantive and retroactive."   The tribe wants the court "to overturn the State's 2002 calculation of the

aggregate Gaming Device license limit and increase that limit as it applies to San Pascal," not "injunctive relief requiring the State to follow a particular process in the future." Def.'s Reply To CNIGA Brief 6:12-17. "Indeed, San Pascal seeks no injunctive relief whatsoever." Id. 6:17-18.

### III.     CONCLUSION AND ORDER

For all the foregoing reasons, the court finds necessary parties indispensable to this litigation cannot be joined.  Accordingly, **IT IS HEREBY ORDERED** Defendants' Rule 12(b)(7) and (19) Motion To Dismiss the Second Amended Complaint is **<u>GRANTED</u>** for failure to join necessary and indispensable parties.  The Clerk of Court shall terminate this case in its entirety.

**IT IS SO ORDERED**.

DATED:  March 20, 2007

**Honorable Larry Alan Burns**
United States District Judge